UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

|  |  |
|---|---|
| In re | Case No.   6:15-bk-05642-CCJ<br>Chapter 11 |
| BANKERS' BANCORPORATION<br>OF FLORIDA, INC., |  |
| Debtor. | **Emergency Relief Requested on or**<br>**before July 13, 2015** |

**MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b); FED. R.
BANKR. P. 2002, 6004, 6006 AND 9014; (I) APPROVING (A) BIDDING PROCEDURES
AND (B) THE FORM AND MANNER OF NOTICE OF (i) THE SALE OF CERTAIN
ASSETS AND (ii) GRANTING RELATED RELIEF; (II) AUTHORIZING AND
APPROVING (A) THE SALE OF CERTAIN ASSETS;
 (III) WAIVING THE 14-DAY STAY OF FED. R. BANKR. P. 6004(h) AND 6006(d)**

**AND**

**CERTIFICATION OF NECESSITY OF REQUEST FOR EMERGENCY HEARING**

The Debtor Bankers' Bancorporation of Florida, Inc. ("BBF"), submits this motion (the

"Motion")[1] seeking the entry of orders, pursuant to 11 U.S.C. §§ 105(a) and 363(b); Fed. R.

Bankr. P. 2002, 6004, 6006, and 9014; and L.B.R. 2002-1, 6004-1, and 9014-1 (i) approving the

proposed bidding procedures set forth herein (the "Bidding Procedures") for the proposed

acquisition of all of the shares of  IBBF Stock (the "Shares") through a merger with the Buyer,

First National Bankers Bank ("FNBB"), and approving the contemplated  Stock  Transfer

Agreements  (collectively, the "Sale")[2]; (ii) approving certain bidding protections described

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Acquisition
Agreement, dated as of June  26, 2015 by and between BBF and  the Buyer (the "Agreement") attached hereto as
Exhibit A.
[2] The transaction described in the Agreement contemplates transfer of all of the shares in the Debtor BBF's
subsidiary bank through a merger with the proposed purchaser, for ease of reference the transaction is described as a
"sale."

herein, including the Minimum Overbids, the Bidding Increments, and the Stalking Horse Bidder Fee (the "Bidding Protections"); (iii) approving the form and manner of (a) the notice that will be filed with this Court and served on all creditors and parties-in-interest regarding the Sale and related Sale Hearing (as defined hereinafter) (the "Notice of Sale"); (iv) authorizing and approving the Sale, free and clear of all Encumbrances, to the Buyer or to the Successful Bidder (as defined in the Bidding Procedures); (v) waiving the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d); and (vi) granting related relief, including scheduling a hearing to approve the Sale (the "Sale Hearing").    BBF requests that the Court schedule a hearing within ten (10) days of the Petition Date to consider the proposed Bidding Procedures. In support of this Motion, BBF states the following:

## I.  Jurisdiction and Venue

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief herein are §§ 105(a), 363(b), and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"); Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Rule 2002-1, 6004-1, and 9014-1 of the Local Rules for the United States Bankruptcy Court of the Middle District of Florida  (the "Local Rules").

## II.  Background

2.      On June  29, 2015, (the "Petition Date") BBF filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  BBF continues to operate its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in the Debtor's Chapter 11 case. An official committee of unsecured creditors has not yet been formed or appointed.

**A. Events leading to the Chapter 11 filing**

3.      BBF, a Florida corporation, is a financial services holding company based in Lake Mary, Florida.  BBF owns 100% of the common stock of a non-debtor subsidiary:  Independent Bankers' Bank of Florida (the "Bank" and collectively, with BBF, the "Company"), a state chartered correspondent bank formed in 1983 for the purpose of providing services to federally insured depository institutions.

4.      The Bank, a so-called 'Banker's Bank', provides services to federally insured community banks in the State of Florida.  Services offered to these respondent institutions include, but are not limited to, depository services, check clearing services, international services, direct and participation loans, federal funds transactions, investment services, investment securities safekeeping, and certain consulting and advising services.  The stock of BBF is owned by community banks and a substantial amount of the Bank's loans, deposits, federal funds and income arise through transactions with its stockholder banks, their directors and affiliated interests.

5.      The Bank and BBF are highly regulated institutions. The Bank's principal regulators are the State of Florida, Office of Financial Regulation, ("OFR") and the Federal Reserve Bank of Atlanta (the "FRB").   BBF's principal regulators is the FRB. Unless context otherwise requires, references herein to the "Regulators" collectively refer to current and predecessor regulators of BBF, the Bank, and the Buyer.[3]

6.      The 2008-2009 financial and credit crisis – resulting in the failure of over 68 banks in the State of Florida since 2008 -- has significantly reduced the Bank's customers and, in turn, the Bank's business and ability to meet certain regulatory requirements for capital, profitability and credit quality. Beginning approximately six years ago, effects from the crisis,

---

[3] The Buyer's  primary regulators are the FDIC and the Office of the Comptroller of the Currency (the "OCC").

including tumbling home prices, soaring loan defaults, and high unemployment rates, began to take their toll on the Company's financial condition.

**B.  Regulatory action**

7.     The Bank's excessive levels of adversely classified assets and inability to raise necessary additional capital have been major causes of increased scrutiny and action by the Regulators.  In May 2009, the FRB performed a safety and soundness examination of the Bank. The examination by the FRB noted unsatisfactory conditions in a number of areas which, if not corrected, could worsen into a more severe situation. As a result, in October 2009, the Bank and BBF agreed to the entry of a "Written Agreement", with the FRB and the OFR.  The Written Agreement is a formal agreement for the Bank to take corrective actions, consistent with sound banking practices, to improve the unsatisfactory conditions, and to adopt appropriate procedures to ensure the Bank's future compliance with all applicable laws, rules, regulations, and regulatory policy statements. In addition, the Written Agreement restricts the Bank's ability to declare or pay dividends to the parent company, BBF, without prior written approval from supervisory authorities. Failure to adequately comply with the Written Agreement could eventually allow the banking regulators to appoint a receiver or conservator of the Bank's assets.

8.     The Bank continues to remain less than well capitalized, and full satisfaction of the terms of the Written Agreement will depend on raising a significant amount of additional capital.  Any undercapitalized banking institution, and particularly one that has failed to comply with an order to recapitalize, is subject to a wide variety of enforcement remedies by regulators, including seizure of the Bank.

**C. The Company's efforts to recapitalize through equity investment, sale or merger**

9.      In 2009, the Company raised certain limited capital, $1.78 million, and in 2010 an additional $5.4 million, through the offering of shares to its respondent banks.  This capital was injected into the Bank. The Company thereafter worked hard, and successfully, to improve its balance sheet through the management of its criticized assets and by maximizing the efficiency of its operations internally.

10.      Given the continuing severity of its problems and a diminishing asset base, however, in 2013 the Company engaged The Hovde Group ("Hovde"), an investment banking firm specializing in the banking industry, to assist it in its search for new sources for capital. Hovde engaged in an extensive outreach to entities with the capacity to capitalize or merge with the Bank.  Hovde identified nine (9) interested banking companies who requested non-disclosure agreements.  Three (3) entities proceeded with a review and a fourth entity reached out directly to Hovde.

11.      In connection with these efforts, Hovde proceeded in 2014 to assist the Bank with accomplishing a so-called "lift-out" or wholesale transfer and disposition of certain criticized assets.  In 2014, the Bank executed a letter of intent to sell certain criticized assets and real estate owned.  This sale or lift-out was intended to make it possible for the Bank to move towards an agreement to secure new capital by providing certainty of asset quality and additional liquidity to its balance sheet.

12.      After arranging for the lift-out sale, Hovde sent revised data to five entities that had previously expressed interest in the Bank.  As the principal asset of BBF is the shares in the Bank and, absent the ability to maintain a balance sheet with sufficient capital,  those shares have little, if any, market value, the only means by which to realize the value of BBF was to attract a

purchaser that in addition to providing cash consideration to BBF, is also willing, able and eligible to assume the obligation of making a substantial equity contribution to the Bank and to thereafter gain regulatory approval for its operation of the Bank. The universe of potential parties both able and interested in such a transaction is small. In the interim, as the Bank's present operations result in a monthly reduction of assets and erosion of capital, BBF realized that it needed to move quickly to realize the remaining value. Only one institution responded with a level of interest that warranted further discussions – the proposed buyer First National Bankers Bank ("FNBB" or "Buyer").

13.     On or about June 12, 2015, the Bank executed a written asset purchase agreement with to Westdale Capital Investors I, Ltd. ("Westdale") providing for the sale of $14,685,958 million (stated principal book balances) in criticized assets and real estate owned for $8,844,613.

**D.  The FNBB proposal**

14.     BBF and the Buyer have agreed, in principle, to the key terms of the Sale, and have executed the Agreement, which remains subject to this Court's approval. A true and accurate copy of the Agreement is attached hereto as Exhibit A. If effectuated, the proposed merger will recapitalize the Bank, ensure the Bank's regulatory compliance, maximize the value available for BBF's creditors, preserve jobs, and save banking regulators substantial amounts, while simultaneously allowing the Bank to continue serving the needs of its respondent banks.

15.     Specifically, the Buyer is prepared to proceed with a transaction that would recapitalize the Bank by merging it with FNBB, and will provide consideration of $1.9 million to BBF.

6

**E.  Key terms and conditions of the Acquisition Agreement**

16.    Pursuant to the Agreement, BBF will cause the Bank to be merged into FNBB, and the merger of the Bank into FNBB will be free and clear of all Encumbrances. The following highlights some of the key terms and conditions of the Agreement, all of which are more fully explained in the Agreement.

**Consideration.** The purchase price and full consideration for the acquisition of IBBF will be an amount equal to (a) Two Hundred Forty Thousand Dollars ($240,000) cash (the "Cash Closing Consideration"), (b) One Thousand Nine Hundred (1,900) shares of FNBB Common Stock valued at Seven Hundred Sixty Thousand Dollars ($760,000) (the "Stock Closing Consideration") and (c) Buyer will cancel the indebtedness amount due by the Seller to Buyer in the principal amount of Nine Hundred Thousand Dollars ($900,000.00) plus any and all accrued interest or other charges due under or related to that note originally dated August 3, 2002 and renewed February 3, 2015  (the "Debt Cancellation Consideration" and together with the Cash Closing Consideration and the Stock Closing Consideration, the "Closing Consideration").  To the extent that the amount of the indebtedness due by BBF to Buyer under or related to that note originally dated August 3, 2002 and renewed February 3, 2015, exceeds $900,000, such amount in excess of $900,000 shall be paid to BBF in additional shares of FNBB Common Stock and such additional shares of FNBB Common Stock shall be considered part of the Stock Closing Consideration.

**Closing Date and Closing Conditions**.  The Sale is subject to approval by the Court and competitive bidding pursuant to the Bidding Procedures Order. Further, consummation of the Contemplated Transactions is jointly subject to certain closing conditions, such as the following:  (i) Court approval of the Bidding Procedures proposed herein  including, without limitation, the Stalking Horse Bidder Fee, (ii) the entry of the final Sale Order by the Court approving the Contemplated Transactions; and (iii) the parties obtaining all governmental authorizations necessary to    permit   the   Contemplated   Transactions, including without limitation, the approval of the Board of Governors of the Federal Reserve System,  and the Florida OFR, as applicable.

**No-Shop Provision**. BBF is authorized to solicit competing proposals to purchase the Bank shares in accordance with the Bidding Procedures Order, but not otherwise.

**Agreements with Management**.  The Buyer intends to maintain continuity of Bank employees, including many of the Bank's current senior managers, as part of its acquisition strategy.  In connection with Buyer's acquisition of the Bank, Buyer intends to offer employment agreements to substantially all of the Bank's employees.  The   Buyer does not have any agreements with any employees of the Bank regarding   post-Sale employment.

**Credit Bidding**.  The Purchaser shall retain the right to credit bid its secured claim of $900,000[4] and the Stalking Horse Bidder Fee at any auction that may be held with respect to the Shares.

**Stock Transfer Agreements**.  The consideration to be paid to BBF by the Buyer includes the Stock Closing Consideration, 1900 shares of stock in FNBB. The shares are deemed to have a value of $400 per share for purposes of the Agreement. To liquidate those shares for purposes of distribution, BBF by this Motion, also seeks authority to enter into the Stock Transfer Agreements, in which three (3) parties, current shareholders of FNBB, will tender contemporaneously with the Closing of the Agreement, cash of $760,000 in exchange for the transfer of the stock.  True and accurate copies of the Stock Transfer Agreements are attached hereto as Exhibit B.

**Waiver of Bankruptcy Rule 6004(h).**  In light of the regulatory and financial pressures on BBF and the Bank, BBF has requested a waiver of the stay imposed by Bankruptcy Rule 6004(h).

## F.  Regulatory approval of the sale

17.    During the months preceding BBF's bankruptcy proceeding, the Company's management engaged in discussions with the Regulators to keep them appraised of the Company's recapitalization efforts.

18.    The Company has disclosed the Buyer's proposed acquisition of the Bank as a proposed mechanism for recapitalizing the Bank.  Although still reviewing the proposed transaction, to date, the Regulators have raised no objections to this bankruptcy filing or the proposed merger.  BBF believes that it can obtain all requisite approvals from the Regulators for approval of the Agreement.

## G.  Proposed timeline for sale of assets

19.    The Buyer deems it essential to its success in acquiring the Bank and successfully closing under the Agreement to do so on an accelerated timeline.  The pendency of these proceedings will create a certain level of uncertainty that is inimical to the welfare of the Bank

---

[4] On or about March 20, 2015, FNBB acquired a secured promissory note in the principal amount of $900,000 from United Southern Bank. The note is secured by a pledge of all of the shares in the Bank.

and its future operations. As the Agreement closing is contingent on regulatory approval of the Buyer's future stewardship of the Bank, and as the prospects for the success of that stewardship will diminish the longer the pre sale uncertainty exists, it is important to the efforts of BFF to deliver the substantial value represented by the Agreement that, as permissible, it succeed in carrying out the sale process as promptly as possible.

20.     BBF proposes the following timeline in connection with the relief sought in this Motion:

| EVENT | DATE |
|---|---|
| Bidding Procedures Hearing[5] | Within 10 days of Petition Date |
| Deadline for competing bids | 5 days before Sale Hearing |
| Auction Date (if necessary) | 3 days before Sale Hearing |
| Sale Hearing[6] | Within 35 days of Petition Date |

21.     BBF believes that after more than two years of exploring potential alternatives for recapitalizing the Bank, every party that reasonably could be expected to consummate a transaction to purchase, recapitalize, or merge with BBF or the Bank has either been contacted directly, or made aware of the potential Bank sale.  Accordingly, BBF believes that the proposed timeline is more than sufficient to complete a fair and open process that will maximize value for the assets.

### III.  Relief Requested

22.     By this Motion, BBF seeks entry of the "Bidding Procedures Order" (substantially in the form attached hereto as Exhibit C), which (i) approves the Bidding Procedures; (ii) approves the Bidding Protections, including the Stalking Horse Bidder Fee, the Initial Minimum

---

[5] Agreement, Section 6.14(c)(i) requires the hearing to be held within 15 days of the Petition Date.
[6] Agreement, Section 6.14(c)(ii) requires the hearing to be held within 30 days of the entry of the Bidding Procedures Order.

Overbid, and the bidding increments described below; (iii) approves the form and manner of the Notice of Sale; and (iv) grants related relief.

23.      Further, by this Motion, BBF requests that the Court set a Sale Hearing within 35 days of the Petition Date.   At the Sale Hearing, subject to the outcome of the Auction (if necessary), BBF requests entry of an Order   (the "Sale Order" ), which (i) approves the Agreement; (ii) confirms that the sale of the Shares shall be free and clear of all Encumbrances; (iii) confirms that BBF may enter into the Stock Transfer Agreements attached hereto as Exhibit B as part of the closing; (iv) waives the 14-day stay incorporated by Bankruptcy Rules 6004(h) and 6006(d); and (vii) approves certain findings of fact and conclusions of law, including, without limitation, that all requirements imposed by Bankruptcy Code section 363(f) have been satisfied, that the Buyer is a good faith purchaser entitled to the protections of Bankruptcy Code section 363(m), and that the terms of the Sale are fair and reasonable.

## IV.  Basis for Relief

### A.  Necessity for sale

24.      BBF has concluded that the only way to recapitalize the Bank (avoiding the risk of its seizure by regulators), and thereby realize value for BBF and its stakeholders, is to conduct a sale of the Bank pursuant to Section 363 of the Bankruptcy Code.   BBF submits that the proposed sale, on the timeframe set forth herein, provides for the maximum value for BBF and its stakeholders.

25.      It is imperative that the sale process be conducted in an expeditious manner for a number of reasons.   First, as a result of the BBF's required public announcement of this

bankruptcy filing, there is a potential for customer confusion.[7] Notwithstanding the fact that substantially all of the Bank's customer deposits are fully protected by FDIC insurance, during any prolonged period of uncertainty, customers may become concerned and may look elsewhere for banking services.

26.      Second, the universe of potential investors who have both the financial backing and ability to satisfy the regulatory prerequisites to consummate a purchase of the Bank is very small.  Most, if not all, of these entities have already investigated and declined to be a part of the Company's recapitalization efforts.  Accordingly, prolonging the process in order to attempt to find other alternatives would be futile and a waste of estate assets.  The specialized nature of the Bank, as a bank for other banks, makes it of interest, for the most part, only to banks such as FNBB, engaged in a similar business.

27.      The Company has only been able to locate one potential acquirer -- the Buyer -- that has put forth a viable sale proposal.  Failure to timely consummate the proposed Sale could cause the Company to lose the one viable bid that will allow it to optimally recapitalize the Bank and preserve value for BBF and its creditors.

28.      In sum, BBF submits that the proposed timeline and procedures described herein achieve the overarching objectives of the Company: recapitalizing the Bank as required by the Regulators and preserving the Bank's going concern for the benefit of its stakeholders.

**B.      The proposed bidding procedures**

29.      BBF crafted the Bidding Procedures to permit an expedited sale, as necessitated by the risks faced by the Bank, while simultaneously fostering an orderly and fair sale process.

---

[7] Indeed, this precise scenario happened to IndyMac. Depositors withdrew a total of $1.3 billion after certain third-party statements sparked widespread panic. Reuters' News, *U.S. seizes IndyMac as financial troubles spread*, July 12, 2008, *available* at http://www.reuters.com/article/idUSWA000014120080712.

BBF has determined that the Bidding Procedures establish a framework that will maximize the value of the Bank for the benefit of BBF's estate, its creditors, and other interested parties.

30.    The proposed Bidding Procedures are attached hereto as <u>Exhibit D</u>. Those procedures are summarized in relevant part below subject to qualifications outlined in the Bidding Procedures.[8]

**Participation Requirements.**  Before a potential bidder may receive any confidential information from BBF or the Bank, submit an Initial Overbid (defined below), or participate in the Auction, a potential bidder other than the Buyer (an "Overbidder") must submit each of the following to BBF:  (i) an executed confidentiality agreement and (ii) current audited financial statements and the latest unaudited financial statements (collectively, the "Financials").

**Bid Deadline.**  In order to participate at the Auction, an Overbidder must submit its bid in a form acceptable to BBF (with copies to certain professionals as explained in the Bidding Procedures) on or before five (5) days before the Sale Hearing (the "Bid Deadline").

**Bid Requirements.**  A bid must be a written irrevocable offer from an Overbidder and shall contain, among other things, the following: (a) a proposed purchase agreement (the "Competing Purchase Agreement") on substantially the same terms and conditions as those in the Agreement[9]; (b) a cashier's check made payable to the order of BBF in the amount of ($375,000) (the "Overbidder's Deposit") which will be retained by BBF as a deposit; (c) admissible evidence in the form of affidavits or declarations establishing, among other things, the Overbidder's financial ability, good faith, and ability to perform the obligations under the Competing Purchase Agreement (collectively, the "Bidder Representations"); (d) confirmation that the offer will remain open until one business day after the Closing; (e)  terms and conditions that are higher and better than the terms and conditions of the Agreement; (f) a bid that exceeds the Closing Consideration by at least the sum of the Stalking Horse Bidder Fee and $125,000 (the "Initial Minimum Overbid") and provides for the recapitalization of the Bank on terms not less favorable than the Agreement or that have otherwise been approved by the Regulators; (g) sufficient information to establish that the Overbidder is capable of obtaining all required regulatory approvals required to consummate the Sale; and (h) a statement indicating that the Overbidder consents to the core jurisdiction of the Bankruptcy Court for all disputes relating to the Auction or the Sale.

---

[8]The summary of the Bidding Procedures set forth herein is provided for informational purposes only. Interested parties should read the entire Bidding Procedures, which are annexed hereto as Exhibit D.  In the event of any conflict between the Bidding Procedures and this summary, the Bidding Procedures shall control.  Capitalized terms used in this summary have the meaning ascribed to them in the Bidding Procedures.
[9] Provided, however, that the transaction may be an outright sale and not a transfer by merger.

**Qualified Overbidders and Initial Overbid.** A **"**Qualified Overbidder" is any potential Overbidder that both: (i) conforms with the above requirements by submitting a Competing Asset Purchase Agreement, supporting documentation and the Overbidder's Deposit (collectively, an "Initial Overbid"); and (ii) that the Company has determined is reasonably likely to consummate the Sale if selected as the Successful Bidder. The Buyer shall automatically be deemed a Qualified Overbidder. Only Qualified Overbidders may bid for the Shares at the Auction. Any bid submitted by a Qualified Overbidder shall be referred to as a "Qualified Bid."

**Due Diligence.** Neither the Company, nor any of its employees, officers, directors, affiliates, subsidiaries, representatives, agents, advisors, or professionals are responsible for, and shall bear no liability with respect to, any information obtained by potential bidders in connection with the Sale. The Company shall not be obligated to furnish any due diligence information after the Bid Deadline. Each Overbidder shall comply with all reasonable requests for additional information and due diligence by the Company or its advisors regarding the Overbidder and its proposed transaction. Failure by an Overbidder to comply with requests for information and due diligence access shall be a basis for the Company to determine that such Overbidder is not a Qualified Overbidder.

**Bidder Protections.** In order to provide an incentive and compensate the Buyer to serve as the stalking horse bidder, BBF has agreed to provide the Buyer with certain bidder protections commonly approved in other bankruptcy sales. In the event that the Buyer is not the Successful Bidder for the Shares, the Purchaser shall be entitled to collect a $250,000 fee from BBF (the "Stalking Horse Bidder Fee"), which fee will be paid from the sale consideration received from the Successful Bidder.

**As Is, Where Is.** The sale of the Shares shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by BBF, its agents, its advisors, or estate, except to the extent set forth in the Agreement or in BBF's purchase agreement(s) with the Successful Bidder(s). Except as otherwise provided in the Agreement or the purchase agreement(s) with the Successful Bidder(s), all of the right, title and interest in and to the Shares to be acquired will be sold free and clear of all liens, security interests, encumbrances, and interests thereon and there against (collectively, the "Encumbrances"). The Encumbrances will attach to the net proceeds of the sale of such Shares and the Other Purchased Assets, subject to any claim of the Buyer to such proceeds for payment of the Stalking Horse Bidder Fee (as defined above).

**The Auction.** If on the Bid Deadline, the Purchaser is the only Qualified Overbidder, BBF shall not conduct an Auction. Rather, BBF shall request at the Sale Hearing that the Bankruptcy Court approve the proposed Sale of the Shares to the Buyer under the Agreement and request that the Sale Order shall be immediately effective upon entry. If, on the Bid Deadline, there is more than one Qualified Overbidder, BBF will conduct an auction of the Shares (the "Auction"),

subject to approval of the Bankruptcy Court, in which the Buyer and all other Qualified Overbidders may participate.

**Auction Procedures.**  The Auction will be governed by the following procedures, the most significant of which include the following (the "Auction Rules"):  (a) bidding will commence at the amount of the highest bid submitted by a Qualified Overbidder, as determined by BBF; (b) each subsequent bid after the Initial Minimum Overbid will be in increments of no less than One Hundred Twenty-Five Thousand  Dollars ($125,000) (the "Bidding Increments"); (c) the Buyer will have the right, but not the obligation to match bids made by any Qualified Overbidder (and credit the amount of the Secured Debt and the Stalking Horse Bidder Fee), and in such event, the Buyer's matching bid will be deemed the highest and best bid for the Shares; (d) the Auction shall continue until there is only one Qualified Bid  that BBF determines in its reasonable business judgment, after consultation with its advisors, is the winning bid; (e) if, upon conclusion of the Auction the Buyer's final bid matches (or is greater than) the highest bid made by any Qualified Overbidder, BBF will seek the approval of the Bankruptcy Court to sell the Shares to the Buyer; and (f) BBF may elect to deem the Purchaser's final bid to be the highest bid, notwithstanding the receipt of an apparently higher bid from another Overbidder.

## C.    Notice procedures

31.    BBF shall, within two (2) days of the entry of the Bidding Procedures Order on this Court's docket, serve a copy of each of the Motion, the Bidding Procedures Order, and a copy of the Notice of Sale, substantially in the form annexed hereto as Exhibit E, by first-class mail, postage prepaid, upon the following parties (collectively, the "Notice Parties"):  (i) all entities known to have expressed an interest in a transaction with respect to recapitalization of the Company (including without limitation a purchase of the Shares, or a portion thereof), as evidenced by executing an NDA with the Company, or by participating in discussions with the Company or Hovde after having executed an NDA; (ii) any entities known to have asserted any Encumbrance in or upon the Shares; (iii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion, including the Federal Reserve System and the Florida OFR; (iv) all parties to the Agreement and all related agreements; (v) the Office of the United States Trustee; (vi) the

14

Regulators; (vii) the Internal Revenue Service; (viii) Wilmington Trust as Indenture Trustee; (ix)

all entities that have requested notice in accordance with Bankruptcy Rule 2002; (x) all other

known creditors of BBF; and (xi) counsel to any official committee established in this Chapter

11 case.

## V.  Applicable Authority

**The sale should be approved under Section 363(b) as fair, reasonable, and in the best
interest of creditors.**

32.     Bankruptcy Code section 363(b) and Bankruptcy Rule 6004 authorize a debtor to

sell assets of the estate other than in the ordinary course of business, after notice and a hearing.

In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course

of business may be by private sale or public auction.  *See* Fed. R. Bankr. P. 6004(f)(1).  Here,

BBF believes that its ability to select the highest and best bidder at the Court-supervised Auction

enhances and benefits the marketing process by providing a motivation for bidders to submit a

Qualified Bid with a high market value.

33.     Although section 363(b) does not specify a standard for determining when it is

appropriate for a court to authorize the use, sale or lease of property of the estate, case law has

repeatedly confirmed that such use or sales of estate assets is appropriate if the sales or uses are

based upon a debtor's sound business judgment.  *See In re Gulf States Steel, Inc. of Alabama*,

285 B.R. 497, 514 (Bankr. N.D. Ala. 2002) (providing that the business judgment standard

should be used when evaluating a sale motion under section 363(b)); *In re Tropical Sportswear

Int'l Corp.*, 320 B.R. 15, 17-18 (Bankr. M.D. Fla. 2005) (applying sound business justification

standard in authorizing payment of prepetition claims pursuant to section 363(b)); *In re

Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a

sound business purpose justifies the use, sale or lease of property under Section 363(b), courts

15

consider a variety of factors, which essentially represent a '*business judgment test*.'")(emphasis added).    This "business judgment test" requires that: (i) there is a sound business reason justifying the sale; (ii) adequate and reasonable notice of the sale has been furnished to interested parties; (iii) the sale price is fair and reasonable; and (iv) the purchaser has acted in good faith. *See In re Delaware & H.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *see also In re Lorraine Brooke Associates, Inc.*, No. 07-12641-BKC-AJC, 2007 WL 2257608, at *4 (Bankr. S.D. Fla. Aug. 2, 2007) (applying business judgment standard as defined in *In re Delaware*). All of these factors are satisfied here.

**There is a sound business reason for the Sale.**

34.    Once a business justification is articulated, a presumption arises that the directors acted on an informed basis, in good faith, and in the best interest of the company, and courts show great deference to the debtor's business decisions. *See In re First Foliage, L.C.*, No. 10-27532-BKC-LMI, 2011 Bankr. LEXIS 1979, * at 11 (Bankr. S.D. Fla. February 14, 2011) (authorizing sale of substantially all of the debtor's assets and finding that the sale transaction was undertaken in good faith without collusion); *In re ALH Holdings LLC*, 675 F. Supp. 2d 462, 477 (D. Del. 2009)(business judgment rule "creates a presumption that 'in making a business decision the directors of a corporation acted on an informed basis, in good faith …" -- overcoming this presumption is a "near-Herculean task"); *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995)(if the procedures utilized by the directors are applied fairly, and if the directors do not violate any of their fiduciary duties their decision will not be second-guessed); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992)(the business judgment rule's presumption "shields corporate decision-makers and their decisions from judicial second-guessing"); *In re Johns-Mansville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)(signaling *In re Curlew Valley Assoc.*, 14 B.R. 506, 513 (Bankr. D. Utah 1981)(where the debtor articulates

a reasonable basis for its business decisions "courts will generally not entertain objections to the debtor's conduct"); *Pitt v. First Wellington Canyon Assoc. (In re First Wellington Canyon Assoc.)*, 1989 WL 106838, *3 (N.D. Ill. 1989)(the debtor's business judgment must be accorded deference unless the debtor's decision was "taken in bad faith or in gross abuse of the debtor's retained discretion").

35.    In this analysis courts use an illustrative list of considerations, on a case-by-case basis, to determine whether the business justification is sufficient, including:

- The proportionate value of the asset to the estate as a whole;

- The amount or elapsed time since filing the petition;

- The effect of the proposed disposition on the  future plans of reorganization;

- The amount of proceeds to be obtained from a disposition compared to a valuation of the asset; and

- Most importantly, whether the asset is increasing or decreasing in value.

*In re Tidal Constr. Co.*, 446 B.R. 620, 623 (Bankr. S.D. Ga. 2009); *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226(5th Cir. 1986)(citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983)); *Matter of Baldwin United Corp.*, 42 B.R. 888, 905-06 (Bankr. S.D. Ohio 1984)).

36.    Here, BBF's business justification is made much easier given the unique nature of the Bank as a regulated entity, and the current state of the financial markets:

- The proportionate value of the Shares to the estate is substantial given that BBF is a financial services holding company and the Shares represent all of its assets;

- The Company has been subject to the terms of the Written Agreement with Regulators for five (5)  years;

- The Bank has been marketed extensively, and the Sale will be subject to a competitive bidding process as set forth in the Bidding Procedures;

- As of the date hereof, despite extensive marketing, BBF and the Bank have received no other offers to purchase the Shares;

- The Agreement is the result of an arm's length negotiation that will result in a net payment of approximately $1.9 million, and will through the merger result in the operations of the bank being assumed by a well-capitalized entity; and

- Finally, and most importantly, the failure to close the sale transaction could result in actions by the Bank's regulators, which could, in turn, severely impact creditor recoveries.

Therefore, sound business justifications exist enabling this Court to approve implementation of the Bidding Procedures and, ultimately, a sale of the Bank.

**The Bidding Procedures provide adequate and reasonable notice of the Sale.**

37.    Section 363 of the Bankruptcy Code requires that interested parties receive adequate notice of the sale. Full disclosure of the terms of the Sale will be provided through transmittal of the Notice of Sale as described above. Such notice is reasonably calculated to provide timely and adequate notice to BBF's major creditor constituencies, those parties most interested in this case, those parties that may have an interest in the Shares, and those parties potentially interested in bidding on the Shares.

**The Purchase Price is fair and reasonable.**

38.    An auction sale is generally considered to establish sufficient value for the assets being sold. *See, e.g., In re TWA, Inc.*, 2001 Bankr. LEXIS 980, *13 (Bankr D. Del. 2001)("The auction procedure [in a 363 sale] has developed over the years as an effective means for producing an arm's length fair value transaction."); *In re Celotex Corp.*, 204 B.R. 586, 612 (Bankr. M.D. Fla. 1996) (equating the value of the debtor's assets to the value received from a hypothetical auction sale of such assets).   BBF believes that the Sale process has been structured in a manner that will secure the highest purchase price for the assets being sold. BBF and Hovde have extensively marketed the Company, the Bank and the Shares. That process culminated in

the realization of the highest and best offer, from the third-party, non-insider Purchaser, to acquire the Shares.

39.     BBF will also provide a Notice of Sale to all known potential bidders, thereby maximizing the possibility that competing bidders will come forward to pay a higher price for the Shares and the Other Purchased Assets than offered by the Buyer in the Agreement.   In essence, the Buyer has set the floor for the bidding at the Auction.

40.     Buyer specifically retained Hovde to act as financial advisor to BBF and to assist BBF in identifying and analyzing possible transaction structures.   Hovde has made presentations to the Board of Directors of BBF for the purpose of assisting the Board of Directors of BBF in making a reasoned and well informed decision regarding any course of action, which included, without limitation (i) a review of efforts to raise capital through a recapitalization of BBF and/or a business combination, and a sale to a strategic partner or buyer through a business combination or otherwise, (ii) a review of market conditions and comparable market transactions, (iii) an overview of the current regulatory environment as it relates to a recapitalization, (iv) an evaluation of the execution risk of one or more proposed transactions involving potential second parties, and (v) an analysis of, and advice regarding, existing bids.   That impartial analysis and advice helped BBF determine the basis for the purchase price set out in the Agreement, which further demonstrates the fairness and reasonableness of the Closing Consideration.

41.     Based on extensive marketing efforts and negotiations surrounding the Agreement, with the assistance of Hovde, BBF believes that the Buyer's offer (subject to overbid at the Auction) satisfies the requirement that the price paid for the Shares be fair and reasonable.

**The Sale is in good faith and thus the Buyer or the Successful Bidder should be afforded the protections of 11 U.S.C. § 363(m).**

42.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to any entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

Although the Bankruptcy Code does not define "good faith," courts have found that the good faith requirement focuses principally on the disclosure of all material sale terms and absence of fraud or collusion between bidders. *See, e.g., In re Abbotts Dairies*, 788 F.2d 143, 147-48 (3rd Cir. 1986). It is typically only "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" that leads to a determination that there was a lack of good faith in a sale proceeding. *Id.*

43.     The Agreement is a product of intensive arm's-length negotiations between BBF and the Buyer, and does not contain special treatment for BBF, BBF's estate, the Buyer, or their respective affiliates or insiders.   The Agreement specifically provides for overbids at the Auction.  Moreover, BBF submits that any purchase agreement reached as a result of the Bidding Procedures will be an arm's-length, negotiated transaction entitled to the protections of section 363(m).  In addition, the terms of the Sale will be fully disclosed to creditors and other potential bidders pursuant to the Notice of Sale as described above.

44.     Based on the foregoing, the Buyer or the Successful Bidder, as the case may be, should be deemed a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

**The Sale satisfies the requirements of Bankruptcy Code Section 363(f) for the sale of the estate's assets free and clear of liens, claims, and encumbrances.**

45.     Section 363(f) of the Bankruptcy Code permits debtors to sell assets free and clear of liens, claims, and encumbrances with interests in the property attaching to the net proceeds of the sale. Section 363(f) provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

46.     BBF believes that one or more of the tests set forth in section 363(f) are satisfied here.  First and foremost, the Shares are not encumbered by any recorded lien, security interest, or other encumbrance with the exception of the Secured Claim held by the Buyer.  To the extent there is any unrecorded interest in the Shares, BBF submits that Bankruptcy Code section 363(f)(5) would apply to permit the Sale free and clear of such interests.  In addition, because BBF is unaware of any interests or encumbrances upon the Shares other than the Secured Claim (which claim will be satisfied in full through the proposed sale), BBF submits that the assertion of any interests in those assets will be in bona fide dispute, requiring application of Bankruptcy Code Section 363(f)(4).

47.     Because BBF has satisfied one of the alternative conditions set forth in Section 363(f), BBF requests that the Shares and the Other Purchased Assets be transferred to the

Purchaser free and clear of all Encumbrances with interests in property attaching to the proceeds of the Sale of the Shares and the Other Purchased Assets.

> **The proposed Bidding Procedures are fair and designed to maximize the value of BBF's estate.**

48.    Bidding procedures should be approved where the debtor has exercised sound business judgment in developing those procedures.  *See In re Holley Performance Prods.*, 2009 Bankr. LEXIS 4683, *5 (Bankr. D. Del. 2009); *In re Gulf States Steel*, 285 B.R. at 514. Here, BBF prepared the Bidding Procedures in order to maximize the potential recovery for BBF, the Bank, and their stakeholders in connection with the proposed Sale of the Shares.  The Bidding Procedures provide for an open bidding process that will provide all potential bidders with the opportunity to participate and test the Purchaser's proposed sale price through an auction process.  Because the Bidding Procedures are fair, reasonable, and a sound exercise of BBF's business judgment, BBF submits that approval of the proposed Bidding Procedures is warranted.

> **The proposed Stalking Horse Bidder Fee is necessary to preserve the value of BBF's estate.**

49.    This transaction is unique.   Any prospective Bank purchaser must not only compensate the estate for the value of the Shares, but must also obtain regulatory approval.

50.    In order to obtain regulatory approval, the Buyer has agreed to cause the Bank to be merged with the Buyer and thus committed the Banks' substantial capital to shoring up and sustaining the operations of the Bank.  As the Buyer is also a regulated institution, the size of this commitment will cause it to otherwise allocate and reserve capital for the potential sale under the Agreement that could be used for other purposes and opportunities.  The Buyer is taking all of the steps necessary to obtain regulatory approval, including negotiation of the Agreement in a form tailored to gain the acceptance of the Regulators.  These efforts will require the Buyer to make a substantial investment in the time and resources of its top management and outside

professionals.   The Buyer will also be required to invest the substantial cost and expense of pursuing the consummation of this transaction through the Bankruptcy Court.   Because BBF insisted that the transaction be subject to higher and better offers, the Buyer understandably requested certain bidding protections and was unwilling to make this offer and proceed with the Agreement without such protections.   BBF believes that approval of the Stalking Horse Bidder Fee will maximize realizable value of the Shares for the benefit of BBF's estate and creditors.

51.   Under the proposed Bidding Procedures, in the event the Buyer is not the Successful Bidder for the Shares, BBF would be required to pay a Stalking Horse Bidder Fee of $250,000.   Of course, in order for the Stalking Horse Bidder Fee to be triggered, the Buyer would have to be out-bid by another Qualified Bidder in an amount exceeding the Stalking Horse Bidder Fee (plus an overbid amount).

52.   Approval of a stalking horse bidder fee is appropriate if such protections are necessary to preserve the value of the estate.   There are two primary ways that bid protections, such as a stalking horse bidder fee, create or preserve value for a debtor's estate.   First, bid protections can preserve value for the estate if assurance of the bid protections "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "*O'Brien*"); *see also Reliant Energy Channelview LP v. Kelson Channelview LLC*, 594 F.3d 200, 206-07 (3d Cir. 2010) (hereinafter, "*Reliant*"); *see also In re Camtech Precision Mfg.*, No. 10-22760-PGH, 2010 Bankr. LEXIS 6045*, at * 19 (Bankr. S.D. Fla. Dec. 23, 2010) (recognizing that bid protections are designed to facilitate a full and fair process to maximize the value of the debtor's assets).   Second, if the availability of bid protections, such as a stalking horse bidder fee, induce

a purchaser to expend funds and conduct due diligence that determines the true value of the debtor's assets upon which other bidders can rely, the purchaser has created value for the estate by increasing the likelihood that the price at which the debtor's assets are sold will reflect its true worth. *Reliant*, 594 F.3d at 206-07; *O'Brien*, 181 F.3d at 537; *see also Camtech Precision*, 2010 Bankr. LEXIS 6045*, at * 19.

53.     Here, both of these conditions are satisfied.  As set forth above, although the Regulators have placed pressure on the Bank compelling new outside investment or a sale and the Company and Hovde have diligently marketed the Bank for well over two years, the Company has been able to locate only one party -- the Buyer -- that has set forth a viable offer to both recapitalize the Bank and allow BBF to realize value from its most significant asset.  If BBF is unable to quickly consummate the Sale, swift action could be taken by the Regulators, producing disastrous consequences to BBF and its creditors. Thus, approval of the Stalking Horse Bidder Fee is necessary to induce the Buyer to make its proposed bid that will preserve the value that BBF will realize through the Sale and to gain the successful recapitalization of the Bank through the proposed merger -- failure to receive such a bid or consummate the Sale could erode any prospect of creditor recovery.

54.     Moreover, the Stalking Horse Bidder Fee is necessary to compensate the Buyer for the opportunity costs that it has lost through committing capital to this Sale transaction.  The lost opportunity costs are significant.

55.     Thus, the proposed Stalking Horse Bidder Fee is necessary to preserve the value of BBF's estate. The Stalking Horse Bidder Fee induced the Buyer to make its initial bid, and granting this protection is also necessary to prevent the Buyer from withdrawing its offer and compensate the Buyer for the lost opportunity costs associated with setting forth its Sale offer.

The Buyer only agreed to enter into the Agreement if it would receive the Stalking Horse Bidder

Fee, and the Buyer has agreed to consummate the Agreement only if it receives such protection.

Without this protection, the Purchaser could walk away from the Agreement.

56.     Furthermore, the proposed Stalking Horse Bidder Fee is fair, reasonable, and

within the range of similar protections approved in other bank holding company cases where a

bank has been sold. Based on the Closing Consideration of $1.9 million alone, the proposed

Stalking Horse Bidder Fee of $250,000 is in-line with stalking horse bidder fees approved in

recent bank holding bankruptcy cases. *See In re: Premier Bank Holding Company*, Case No. 12-

40550 (Bankr. N.D. Fla. September 13, 2012)(approving breakup fee of $150,000 and expense

reimbursement of $250,000 based on proposed cash purchase price of approx. $1.4 million);

*In re AmericanWest Bancorp.*, Case No. 10-06097 (Bankr. E.D. Wash. November 3,

2010)(approving $1 million breakup fee based on $6,500,000 purchase price).

57.     However, when the Stalking Horse Bidder Fee is compared to the entire value of

the transaction (the Closing Consideration plus added capital support), the proposed bidding

protection represents a small percent of the full value of the transaction.  Such a fee is eminently

reasonable in light of the undertakings that the Buyer has made thus far to preserve the value of

the estate's most valuable asset, including tying up equity capital in order to consummate the

Sale and spending several months in order to develop a proper transaction structure.

### This Court Should Waive the Fourteen-Day Stay Period Imposed by Bankruptcy Rules 6004(h) and 6006(d).

58.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

lease of property… is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise." Fed. R. Bankr. P. 6004(h).  BBF requests that the stay imposed by

Bankruptcy Rule 6004(h) be waived under the circumstances of this case.  It is in the interest of

BBF's creditors and estate that the Sale be consummated as quickly as possible without any stay pending appeal because of the Bank's undercapitalized status, the risk of deposit withdrawals, and the decisive response that the Regulators will implement in the event of significant deposit withdrawals.

59.    BBF has noticed the hearing on this Motion to all of its creditors, interest holders, and other parties-in-interest, and therefore any person having any objection to the Motion has been afforded a reasonable opportunity to voice any objections or concerns. Accordingly, BBF is aware of no prejudice that would be caused by the Court's waiver of Bankruptcy Rule 6004(h). BBF requests that any order approving the Sale be effective immediately by providing that the fourteen-day stay is inapplicable.

60.    Bankruptcy Rule 6006(d) similarly provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."   Fed. R. Bankr. P. 6006(d).  In light of the exigent circumstances outlined above, the assumption and assignment of the 365 Contracts must be effective immediately upon entry of the Sale Order. Therefore, BBF requests waiver of the fourteen-day stay under Bankruptcy Rule 6006(d).

## VI.  Notice

61.    Notice of this Motion has been provided to (i) all entities known to have expressed an interest in a transaction with respect to BBF, the Bank, the Shares (or a portion thereof); (ii) any entities known to have asserted any Encumbrance in or upon the Shares; (iii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion, including the Regulators; (iv) all parties to the Agreement and all related agreements; (v) the Office of the United States Trustee;

(vi) the Internal Revenue Service; (vii) Wilmington Trust as indenture trustee; (viii) all entities that have requested notice in accordance with Bankruptcy Rule 2002; (ix) all other known creditors of BBF; and (xi) counsel to any official committee established in this Chapter 11 case. In light of the nature of the relief requested herein, BBF submits that no other or further notice is required.

## VII.  No Prior Request

62.    No prior request for the relief sought in this Motion has been made to this or any other court.

## VIII. CERTIFICATE OF NECESSITY OF REQUEST FOR EMERGENCY HEARING

63.    I HEREBY CERTIFY, as a member of the Bar of the Court, that I have carefully examined the matter under consideration and to the best of my knowledge, information, and belief formed after reasonable inquiry, all allegations are well grounded in fact and all contentions are warranted by existing law or a good faith argument for the extension, modification, or reversal or existing law can be made, that the matter under consideration is not interposed for any improper purpose, such as to harass, to cause delay, or to increase the cost of litigation, and there is just cause to request a consideration of this matter on an emergency basis.

64.    I CERTIFY FURTHER that there is a true necessity for an emergency hearing, specifically, because the proposed Acquisition Agreement provides that the Bidding Procedures must be approved within fifteen (15) days of the Petition Date.  If the deadline is not met, the Debtor and the estate will lose the advantage of the Agreement, which Agreement is the product of extensive negotiation between the parties and vetting, as detailed more thoroughly above. Based upon the Acquisition Agreement, this matter requires a hearing on or before July 13, 2015.

65.    I CERTIFY FURTHER that the necessity of this emergency has not been caused by a lack of lack of due diligence on my part, but has been brought only by circumstances beyond my control or that of my client.  I further certify that this motion is filed with full understanding of F.R.B.P. 9011 and the consequences of noncompliance with same.

## IX.  Conclusion

For all of the foregoing reasons, BBF respectfully requests entry of an order granting the relief requested herein and such other and further relief as the Court deems just.

Dated: June 30, 2015

> Bankers Bancorporation of Florida, Inc.
>
> By its attorneys,
>
> /s/ Ryan E. Davis
> Ryan E. Davis
> Fla. Bar. No. 0179851
> **Winderweedle, Haines, Ward & Woodman, P.A.**
> 390 N. Orange Avenue
> Orlando, FL  32801
> (407) 246-8685
> rdavis@whww.com
>
>
> Peter J. Haley
> peter.haley@nelsonmullins.com
> J. Brennan Ryan
> brennan.ryan@nelsonmullins.com
> Nelson Mullins Riley & Scarborough LLP
> One Post Office Square
> Boston, MA 02109
>
> *Proposed Counsel for the*
> *Debtor and Debtor in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of June, 2015, a true and correct copy of the foregoing has been furnished via:

***CM/ECF to:***

United States Trustee, George C Young Federal Building, 400 West Washington Street, Suite 1100, Orlando, FL 32801

***Via Electronic Transmission with Exhibits to:***

First National Bankers Bank, Attn:  Joseph F. Quinlan Jr., 7813 Office Park Blvd., Baton Rouge, LA  70809 [jquinlan@bankers-bank.com;  ebrazeal@joneswalker.com]
Wilmington Trust Company, Attn:  Michael Wass, Rodney Square North, 1100 North Market Street, Wilmington DE 19890-1600 [mwass@wilmingtontrust.com; leah.eisenberg@arentfox.com]


***US Mail without Exhibits to:***

Bankers' Bancorporation of Florida, Inc., 615 Crescent Executive Court, Suite 400, Lake Mary, FL 32746
Mr. Steve Wise, Vice President, Federal Reserve Bank of Atlanta, 1000 Peachtree Street, N.E., Atlanta, Georgia 30309-4470
Mr. Barry Gilman, Director, Office of Financial Regulation, State of Florida, 200 E. Gaines Street, Tallahassee, Florida  32399-0371
First National Bankers Bank, Attn:  Joseph F. Quinlan Jr., 7813 Office Park Blvd., Baton Rouge, LA  70809
Wilmington Trust Company, Attn:  Michael Wass, Rodney Square North, 1100 North Market Street, Wilmington DE 19890-1600

/s/ Ryan E. Davis
Ryan E. Davis


**All Exhibits are available upon request.  Please contact Ryan E. Davis, at PO Box 1391, Orlando, FL 32802-1391, (407) 246-8685, or via email transmission at rdavis@whww.com if you wish to receive a copy of the Exhibits attached to this Motion.**